UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANDREW J.J. WOLF,<br><br>                Plaintiff,<br><br>     v.<br><br>JOSH TEWALT; BREE DERRICK;<br>ASHLEY DOWELL; CHAD PAGE;<br>RANDY BLADES; AMANDA<br>GENTRY; ROSS CASTLETON;<br>WATER "WALLY" CAMPBELL;<br>KEITH YORDY; RANDY VALLEY;<br>TIM RICHARDSON; CHESTER<br>MARTIN; LUKE KORMYLO;<br>MICHAEL RICE; AMADA DIETZ;<br>TYRELL DAVIS; SUSAN WESSELS;<br>GARY HARTGROVE; AMANDA<br>HOTTINGER; and JEREMY<br>HRANAC, sued in their individual and<br>official capacities, and their successors<br>in office,<br><br>                Defendants. | Case No. 1:20-cv-00259-BLW<br><br>**INITIAL REVIEW ORDER BY<br>SCREENING JUDGE** |

      The Clerk of Court conditionally filed Plaintiff Andrew J.J. Wolf's Complaint as a

result of Plaintiff's status as an inmate and in forma pauperis request. The Court now

reviews the Complaint to determine whether it should be summarily dismissed in whole

or in part under 28 U.S.C. §§ 1915 and 1915A. Having reviewed the record, and

otherwise being fully informed, the Court enters the following Order directing Plaintiff to

file an amended complaint if Plaintiff intends to proceed.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 1

1.      **Screening Requirement**

The Court must review complaints filed by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity, as well as complaints filed in forma pauperis, to determine whether summary dismissal is appropriate. The Court must dismiss a complaint or any portion thereof that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B) & 1915A(b).

2.      **Pleading Standard**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint fails to state a claim for relief under Rule 8 if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[D]etailed factual allegations" are not required, but a plaintiff must offer "more than ... unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability," or if there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a claim for relief that is plausible on its face. *Id.* at 678, 682 (internal quotation marks omitted).

3.     **Discussion**

Plaintiff is a prisoner in the custody of the Idaho Department of Correction ("IDOC"), currently incarcerated at the Idaho Maximum Security Institution. In this action, Plaintiff challenges, under the Eighth and Fourteenth Amendments to the United States Constitution, his placement and retention in administrative segregation. Plaintiff seeks monetary damages, as well as declaratory and injunctive relief.

Plaintiff has not alleged sufficient facts to proceed with the Complaint. The Court will, however, grant Plaintiff 60 days to amend the Complaint. Any amended complaint should take into consideration the following.

Plaintiff brings claims under 42 U.S.C. § 1983, the civil rights statute. To state a plausible civil rights claim, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To be liable under § 1983, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). Negligence is not actionable under § 1983, because a negligent act by a public official is not an abuse of governmental power but merely a "failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Prison officials generally are not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her

own misconduct."). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent committed misconduct. *Taylor*, 880 F.2d at 1045.

However, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists ... a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). A plaintiff can establish this causal connection by alleging that a defendant (1) "set[] in motion a series of acts by others"; (2) "knowingly refus[ed] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury"; (3) failed to act or improperly acted in the training, supervision, or control of his subordinates"; (4) "acquiesc[ed] in the constitutional deprivation"; or (5) engag[ed] in "conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1205–09.

An official whose only involvement in an inmate's constitutional claim was as a participant in the administrative grievance process generally is not subject to liability under § 1983. For example, an appeals coordinator cannot cause or contribute to a completed constitutional violation that occurred in the past and that is not remediable by any action the reviewer might take. *See, e.g., George v. Smith*, 507 F.3d 605, 609–610 (7th Cir. 2007) ("A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a

completed act of misconduct does not."). If, however, the defendant (1) knew of an ongoing constitutional violation, (2) "had the authority and opportunity to prevent" that violation, yet (3) failed to act to remedy the violation, then the defendant may be liable under § 1983. *See Herrera v. Hall*, 2010 WL 2791586, at *4 (E.D. Cal. July 14, 2010) (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), *report and recomm'n adopted*, No. 1:08CV01882LJOSKOPC, 2010 WL 3430412 (E.D. Cal. Aug. 30, 2010).

A plaintiff cannot simply restate the above standards of law in a complaint. Instead, a plaintiff must provide specific facts supporting the elements of each claim and must allege facts showing a causal link between each defendant and Plaintiff's injury or damage. Alleging "the mere possibility of misconduct" is not enough. *Iqbal*, 556 U.S. at 679.

### A.    Due Process Claims

Plaintiff claims that his confinement in administrative segregation violates the Due Process Clause of the Fourteenth Amendment.

### i.    Factual Basis of Due Process Claims

On January 15, 2018—when Plaintiff was incarcerated at the Idaho State Correctional Institution ("ISCI")—Plaintiff was placed in disciplinary segregation for about a month, after being found guilty of a Class A Disciplinary Offense Report. On February 14, 2018, Plaintiff received a "Restrictive Housing Referral Notice," in which Plaintiff learned that he was being referred to a hearing to determine whether he should be placed in administrative segregation. *Compl.*, Dkt. 3, at ¶¶ 48–53.

Administrative segregation, or "ad-seg," is a restrictive housing unit. Ad-seg is reserved "for those offenders who pose a threat to life, property, self, staff, or other offenders or when an offender's continued presence threatens the secure and orderly operation of the facility." *See* IDOC SOP 319.02.01.001 at 1, *available at* http://forms.idoc.idaho.gov/WebLink/0/edoc/341649/Restrictive%20Housing%20-%20SOP.pdf, "Restrictive Housing."

When Plaintiff received the referral notice, Defendant Dietz asked Plaintiff to waive the 48-hour notice requirement provided for in prison policy with respect to restrictive housing hearings. Plaintiff stated that he would not waive the requirement. Defendant Martin asked why, and Plaintiff stated that policy required the 48-hour period and that Plaintiff was also entitled to written notice "of the information to be considered for ad-seg placement, be allowed witnesses to call on his behalf, and to have a hearing assistant to collect and present evidence for him as well."[1] *Compl*. at ¶¶ 54–57.

Martin told Plaintiff that he would not be provided these things and that Plaintiff could either sign the form and waive the 48-hour notice requirement, or the hearing would be postponed. Plaintiff decided to waive the 48-hour requirement and proceeded to the placement hearing. *Id*. at ¶ 58.

---

[1] In fact, the ad-seg policy does not guarantee any of these things. For example, a staff hearing assistant is not appointed in all cases, but "should be appointed if … "[c]onfidential information exists," if the inmate is illiterate or has a disability that prevents understanding of the hearing, or if the inmate needs a translator. *See* IDOC SOP 319.02.01.001 at 12.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 6

Defendants Kormylo, Rice, and Dietz were the members of the placement committee present at the hearing. Plaintiff had the opportunity to state why he should not be placed in ad-seg. Plaintiff told the committee members that consideration

> needed to be take[n] as to where he would be housed as some inmates did not care for his typing of legal work, and due to his crime as well. Plaintiff also mentioned he had previously worked with ISCI Housing Lieutenant Fraser who came up with the solution to house plaintiff in Unit 11 as opposed to other Units as he was more likely to not have any problems there and didn't while residing there.

*Id.* at ¶ 59.

The committee prepared a summary of the hearing and sent it to Defendant Warden Yordy—who, as the facility head, was authorized to approve, modify, or deny the committee's recommendation. *Id.* at ¶ 60. Plaintiff complains that he was not provided a copy of this summary, but prison policy contains no such requirement. *See* IDOC SOP 319.02.01.001 at 13.

On February 16, 2018, Plaintiff was notified that Warden Yordy had approved Plaintiff's placement in ad-seg. *Compl.* at ¶ 62. Plaintiff alleges that he was not provided "any form of written statement of fact findings as to evidence relied upon for Defendant Yordy's decision …, how long [Plaintiff] would be expected to remain in ad-seg, or what it would take to get out of ad-seg." *Id.* at ¶ 63. The Court's review of the restrictive housing policy reveals that the policy contains no requirement of written findings, of a proposed length of time the inmate may be held in ad-seg, or of notice of the way an inmate can "get out." *See* IDOC SOP 319.02.01.001 at 12–14.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 7

Plaintiff asserts that he did not appeal the ad-seg placement decision because "he was not provided the written statement of fact findings as to reasons for ad-seg so as to make it an [sic] viable appeal with merit and not baseless." *Compl.* at ¶ 64–65. However, Plaintiff acknowledges that he did use the prison grievance process to challenge his placement in ad-seg, which is permitted by prison policy. *See* IDOC SOP 319.02.01.001 at 14 (inmates "can use the grievance procedure to address concerns regarding placement and assignment to restrictive housing"); *see also* IDOC SOP 316.02.01.001, *available at* http://forms.idoc.idaho.gov/WebLink/0/edoc/281409/Grievance%20and%20Informal%20Resolution%20Procedure%20for%20Inmates.pdf, "Grievance and Informal Resolution Procedure for Offenders."

Pursuant to prison policy, an ad-seg review hearing should occur every 120 days—but must occur at least annually—to determine whether continued placement in ad-seg is appropriate. *See* IDOC SOP 319.02.01.001 at 15–18. On June 12, 2018, Plaintiff had his 120-day review hearing. *Compl.* at ¶ 71. Plaintiff complains that he was not given 48 hours' notice of the review hearing, but prison policy does not provide for such notice with respect to *review* hearings—only initial placement hearings. Plaintiff did not receive any written findings regarding the hearing, which is also not required by prison policy. *See* IDOC SOP 319.02.01.001 at 15–18.

Plaintiff remained in ad-seg following the June 2018 review hearing. Plaintiff was supposed to have another 120-day review hearing in October 2018, but that hearing did not take place. *Compl.* at ¶¶ 73–76.

Plaintiff's next ad-seg review hearing was his annual review hearing in March 2019. Defendants Wessels, Hranac, and Hottinger were on the review committee for Plaintiff's annual review hearing. *Id*. at ¶¶ 78–80.

The restrictive housing policy evidently was in the process of being revised at this point, and Plaintiff was told that the committee would be using both the then-current policy and the proposed policy, which had not yet been approved. Plaintiff told the committee he did not believe that either policy provided sufficient due process protections. *Id*. at ¶¶ 81–82. After Plaintiff's annual review hearing, he was notified that he would be retained in ad-seg but would be placed in a "Long-Term Restrictive Housing Step-Up Program." *Id*. at ¶ 84.

Plaintiff's next ad-seg review hearing was held in July 2019, without "any prior written notice." *Id*. at ¶ 86. At the hearing, Plaintiff told case manager Michel that Plaintiff had been referred to the Step-Up Program. Michel stated that the Step-Up course for which Plaintiff was recommended, "Thinking for a Change," had a backlog. Michel also asked Plaintiff if he would like to go back to general population. Plaintiff stated that he would, but that he did not want to be housed in A-Block—the unit that was open at the time—because of "ongoing violence in that unit with the gangs and [Plaintiff's] crime." *Id*. at ¶¶ 87. Corporal Kirk told Plaintiff that, when determining where inmates should be housed, "they take considerations before just placing [Plaintiff] on any tier or walk, and would place [him] on a soft-walk with other prisoners who have the same concerns." *Id*. Plaintiff was not released from ad-seg after this hearing.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 9

In November 2019, Plaintiff had another ad-seg review hearing with Michel. Michel told Plaintiff that there was a "hold" for inmates being placed in the Step-Up Program. However, by this time Plaintiff had completed the "Thinking for a Change" course. It is unclear whether some other course in the Step-Up Program was required for Plaintiff to be rehoused in the general population. Plaintiff again remained in ad-seg following the hearing. *Id.* at ¶ 90.

In October or November 2019, Plaintiff met with Defendant Hranac and informed Hranac of "flaws" in the restrictive housing SOPs. *Id.* at ¶ 90. Plaintiff showed Hranac resources on the Internet and discussed them with Hranac, who took notes during the meeting.

Plaintiff's second annual ad-seg review hearing took place in March 2020, again without specific prior notice. The committee consisted of Defendants Wessels, Hartgrove, and Hottinger. Plaintiff was informed again that both the previous and revised SOPs were being used for different levels of the review process. *Id.* at ¶¶ 91–93. Plaintiff complained to Wessels that he had been referred to the Step-Up Program but "was still waiting to get into it." *Id.* at ¶ 94. Wessels inquired whether Plaintiff had actually applied for the program. When Plaintiff responded that he had not done so and had thought he was already enrolled, he was given an application for the program. *Id.*

Plaintiff expressed frustration with the failure of various IDOC officials to follow policy. And, he once again stated that he did not believe the restrictive housing policy complies with the Due Process Clause. *Id.* at ¶ 96.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 10

In April 2020, Plaintiff was notified that he was to remain in ad-seg, but that he would be considered for the Step-Up Program with his original placement date in 2018. Plaintiff again did not receive "a written statement of fact findings as to evidence relief upon to warrant the continued Ad-Seg placement, how long to expect to remain in it, [or] what to do to get out." *Id.* at ¶¶ 99–100. Plaintiff pursued the grievance process with respect to his continued retention in ad-seg but did not obtain relief.

ii.     <u>The Complaint Does Not State a Plausible Due Process Claim</u>

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person cannot obtain relief on a due process claim unless he demonstrates that he was deprived of one of these protected interests. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989).

A prisoner does not have a liberty interest in being housed in a particular prison facility or a particular unit within a prison facility. *See Meachum v. Fano*, 427 U.S. 215, 218 (1976) ("Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections …."); *McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). This generally is true even with respect to restrictive housing units such as administrative segregation. Because prisoners' liberty is necessarily circumscribed as a result of conviction and incarceration, prisoners have a liberty interest in freedom from restraint only if a change occurs in confinement that imposes an

"atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

*Sandin*'s "atypical and significant hardship" analysis applies to prison disciplinary proceedings and disciplinary segregation. *See id*. at 487. However, it is not entirely clear whether *administrative* segregation, as opposed to disciplinary segregation, can give rise to a protected liberty interest in the absence of additional factors. Indeed, the *Sandin* Court referred to administrative segregation as a form of "totally discretionary" segregation, suggesting that such segregation might never give rise to a liberty interest. *Id*. at 486.

In *Anderson v. County of Kern*, a case decided before *Sandin*, the Ninth Circuit held that "administrative segregation, even in a single cell for twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a sentence" and, therefore, does not implicate a protected liberty interest. 45 F.3d 1310, 1316 (9th Cir.), *opinion amended on denial of reh'g*, 75 F.3d 448 (9th Cir. 1995). However, although administrative segregation "in and of itself does not implicate a protected liberty interest," additional factors can give rise to such a liberty interest when combined with retention in ad-seg. *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003). For example, in *Serrano*, which was decided long after *Sandin*, the Ninth Circuit held that a disabled inmate who was confined in an ad-seg unit—a unit that was not designed for disabled inmates—had a liberty interest in avoiding ad-seg given the inmate's particular circumstances.

The inmate in *Serrano* (1) "wallowed in a non-handicapped-accessible SHU for nearly two months," (2) "was denied use of his wheelchair, which he was permitted to use in the general population," (3) could not take a proper shower[,] … use the toilet without hoisting himself up by the seat," or "partake in outdoor exercise," (4) needed "to crawl into bed by his arms," and (5) was forced to drag himself around a vermin and cockroach-infested floor. These conditions, rather than confinement in ad-seg itself, gave rise to a liberty interest protected by the Due Process Clause:

> In the case at bar, *it is not Serrano's administrative segregation alone that potentially implicates a protected liberty interest*. Instead, Serrano's disability—coupled with administrative segregation in an SHU that was not designed for disabled persons—gives rise to a protected liberty interest. That is, *the conditions imposed on Serrano in the SHU, by virtue of his disability, constituted an atypical and significant hardship on him*.

*Id*. at 1078–79.

Thus, it is not entirely clear whether ad-seg can ever be deemed to constitute an "atypical and significant hardship" in the absence of additional factors that, as in *Serrano*, could give rise to a liberty interest. But, assuming *Sandin* does apply in such a situation—and assuming an inmate shows that ad-seg constitutes an atypical or significant hardship—then a court must then consider the process that the prisoner was due.

This determination must be made on a case-by-case basis. *Wolff v. McDonnell*, 418 U.S. 539, 560 (1974) ("Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been

INITIAL REVIEW ORDER BY SCREENING JUDGE - 13

affected by governmental action.") (internal quotation marks and alteration omitted). The "essence of due process" is notice and an opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). Due process is a flexible concept and calls for such procedural protections as the particular situation demands. *Id*.

If an inmate shows he has a liberty interest in avoiding administrative segregation, due process requires only an informal, nonadversarial process to confine the inmate in ad-seg. *Hewitt v. Helms,* 459 U.S. 460, 472 (1983), *abrogated on other grounds by Sandin,* 515 U.S. 472; *see also Wilkinson v. Austin*, 545 U.S. 209, 229 (2005) ("Although *Sandin* abrogated *Greenholtz*'s and *Hewitt*'s methodology for establishing [a] liberty interest, these cases remain instructive for their discussion of the appropriate level of procedural safeguards."). If prison officials provide such a process to an inmate, then the Due Process Clause is satisfied.

Plaintiff's due process claims are implausible for two reasons. First, the Complaint does not give rise to a reasonable inference that the conditions in ad-seg constitute an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Sandin,* 515 U.S. at 484. Thus, Plaintiff has not plausibly alleged that he had a liberty interest in avoiding placement and retention in ad-seg.

Second, even if Plaintiff did have such a liberty interest, he received all the process he was due. Plaintiff had notice that he was being considered for initial ad-seg placement and had a hearing on that potential placement. The fact that prison policy provided for a notice period is not relevant, as prisons are not constitutionally required to

INITIAL REVIEW ORDER BY SCREENING JUDGE - 14

follow their own, more generous procedures. *Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994), *abrogated on other grounds by Sandin*, 515 U.S. 472 (1995); *Huron Valley Hosp. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989) ("[Section 1983] is thus limited to deprivations of *federal* statutory and constitutional rights. It does not cover official conduct that allegedly violates *state* law." (relying on *Baker v. McCollan*, 443 U.S. 137, 146 (1979)). And it was *Plaintiff's* decision to waive that notice requirement, in any event.

Plaintiff was given periodic review hearings regarding his continued confinement in ad-seg, including two annual review hearings. Plaintiff does not allege that he did not have notice of the ad-seg review hearing policy, so the fact that he did not receive an additional, specific notice immediately before each review hearing is of no consequence. Further, that one of these review hearings did not occur does not establish a due process violation, given that Plaintiff received several other review hearings throughout his confinement in ad-seg. Thus, Plaintiff had notice and an opportunity to be heard, with respect to his ad-seg placement and retention, in an informal, nonadversarial process—which is all the Constitution requires. *See Hewitt*, 459 U.S. at 472.

For these reasons, the Complaint does not state a claim upon which relief may be granted under the Fourteenth Amendment's Due Process Clause.

### B.      *Conditions of Confinement Claims*

Plaintiff also claims that the conditions in ad-seg constitute cruel and unusual punishment in violation of the Eighth Amendment.

i.      Factual Basis of Conditions-of-Confinement Claims

At the time Plaintiff filed the instant action, he had been residing in ad-seg for 29 months. Plaintiff states that inmates in ad-seg are confined to their cells for 23 or 24 hours per day. *Compl*. at ¶ 106. They are allowed to shower every other day, unless the facility is short-staffed or in lockdown, in which case ad-seg inmates shower every three days. Although ad-seg inmates are permitted recreation, Plaintiff states that when in recreation, inmates are held in a 5x6 feet "dog cage that is smaller than the cell ad-seg prisoners are confined in"; Plaintiff also states that the recreation cage has "no view except to the sky." *Id*. at ¶¶ 115–16.

Ad-seg inmates find visitation difficult, because they are required "to submit a request [for visitation] 1-week in advance, then there is no physical contact allowed as it occurs behind plexiglass with a phone to use to communicate with your visitors if it works, otherwise they have to talk loud to be heard." *Id*. at ¶ 117. These regulations "frustrate Plaintiffs [sic] visitors from wanting to visit at all." *Id*.

At one point, IDOC officials installed desks in the dayroom, allowing ad-seg inmates to interact socially with each other. However, six months later, this practice was discontinued. *Id*. at ¶ 118.

Ad-seg cells are approximately 70 square feet, which is 10 square feet less than standards set forth by the American Correctional Association. In addition to a sink and toilet, the cells "contain[] a metal bunk bed, 2 metal shelves and a … desk with storage inside it but no stool to properly use it." *Id*. at ¶ 120. The cells provide a view to the outside "but not to surrounding environment." The doors to the cells are mostly solid,

with a 4x16 inch window looking into the dayroom. "Social contact is very limited to when staff performs 30-minute tier checks, mail, showers, medical appointments, recreation, or visiting." *Id*. Cell temperatures are hot in the summer and cold in the winter. And, although there is a TV in the dayroom, ad-seg inmates do not have a transmitter that would permit them to listen to it by radio. Plaintiff also complains that, although a mental health clinician visits each cell once per week, she will not wake the inmate up if the inmate is asleep. *Id*.

Because of these conditions, Plaintiff states that he "experiences unrelenting and crushing mental anguish, pain and suffering." *Id*. at ¶ 123. He is allegedly "without normal human interaction, in stark restrictive conditions, without any hope for relief." *Id*. Plaintiff also states that there are devastating physical and mental effects of prolonged retention in ad-seg, such as "a) hyper responsivit[y] to external stimuli; b) perceptual distortions, illusions and hallucinations; c) panic attacks; d) difficulties with thinking, concentration, and memory; e) intrusive obsessional thoughts; f) overt paranoia; g) problems with impulse [control], including random violence and self-harm; h) flashbacks, chronic hypervigilance and hopelessness and i) post-traumatic stress disorder." *Id*. at ¶ 125. Plaintiff states that other symptoms may include problems sleeping, headaches, weight loss, pain, cataracts, shaking, and fatigue. *Id*. at ¶ 126.

> ii.    The Complaint Does Not State a Plausible Eighth Amendment Claim Based on the Conditions of Confinement in Ad-Seg

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits

cruel and unusual punishment. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble,* 429 U.S. 97, 102 (1976) (internal quotation marks omitted). However, it "does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Although conditions of confinement may be harsh and restrictive without violating the Eighth Amendment, they cross the line into cruel and unusual punishment when they (1) involve "the wanton and unnecessary infliction of pain," (2) are "grossly disproportionate to the severity of the crime warranting imprisonment," (3) result "in unquestioned and serious deprivation of basic human needs, or (4) deny an inmate "the minimal civilized measure of life's necessities." *Id.* at 347.

An inmate challenging the conditions of his confinement must make two showings. First, the plaintiff must make an objective showing that the deprivation was serious enough "to form the basis for an Eighth Amendment violation." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). "Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Rather, the deprivation alleged must be objectively sufficiently harmful or, in other words, sufficiently "grave." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

Second, the plaintiff must make a subjective showing that the defendant acted "with a sufficiently culpable state of mind." *Johnson*, 217 F.3d at 731 (internal quotation marks omitted). This state of mind is referred to "deliberate indifference." *Id*. at 733.

To establish deliberate indifference, an inmate must show that the defendant (1) was aware of the risk to the prisoner's health or safety, and (2) deliberately disregarded that risk. That is, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence is not sufficient to establish deliberate indifference. *Id*. at 835. "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Finally, even if a plaintiff shows that prisons officials were subjectively aware of the risk to the plaintiff, the officials still will not be liable under § 1983 "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. This is because, in such a case, the officials did not deliberately disregard that risk.

Plaintiff has not plausibly alleged that the conditions in ad-seg are objectively sufficiently grave or harmful to form the basis of an Eighth Amendment violation. The conditions Plaintiff describes certainly are not pleasant. However, they are nowhere near

"the physical torture against which the Constitution clearly protects," but instead are closer to "the *de minimis* harms against which it does not." *McKune*, 536 U.S. at 41. Plaintiff is permitted to interact with correctional officers, he is regularly taken outside, and he can shower two or three times per week. The size and temperature of the ad-seg cells might not be comfortable, but the Complaint does not plausibly suggest that those temperatures are inhumane so as to rise to the level of an Eighth Amendment violation.

Finally, Plaintiff's claims based on standards of national or international organizations are implausible, because deviation from such standards does not necessarily violate the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) ("[W]hile the recommendations of [such] various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question.").

### C.    *Potential Medical Treatment Claims*

It is unclear whether Plaintiff intends to assert a claim of inadequate medical treatment, as the Complaint does not expressly assert such a claim. *See Compl*. at ¶¶ 136–47. Plaintiff complains that he developed cataracts, that it took 10 months for him to receive cataract surgery, and that the mental health clinician does not wake inmates up to check on them if they are sleeping during the clinician's weekly rounds. However, these allegations may be offered not to assert an independent constitutional violation, but as support for Plaintiff's Eighth Amendment or due process claims. In any event, Plaintiff's allegations do not plausibly allege that any Defendant subjectively knew of a substantial risk of serious harm to Plaintiff's health yet deliberately disregarded that risk.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 20

If Plaintiff intends to assert medical treatment claims in an amended complaint, he should consider the following legal standards. Regarding the objective standard for prisoners' medical care claims, "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ....

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). Medical malpractice does not support a cause of action under the Eighth Amendment, *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam), and a delay in medical treatment

does not violate the Eighth Amendment unless that delay causes further harm, *McGuckin*, 974 F.2d at 1060.

Differences in judgment as to appropriate medical diagnosis and treatment between an inmate and prison medical providers—or, for that matter, between medical providers—are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Stated another way, a plaintiff must plausibly allege that medical providers chose one treatment over the plaintiff's preferred treatment "even though they knew [the plaintiff's preferred treatment] to be medically necessary based on [the plaintiff's] records and prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1117 (N.D. Cal. 2015). If medical personnel have been "consistently responsive to [the inmate's] medical needs," and the inmate has not shown that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061.

Non-medical prison personnel generally are entitled to rely on the opinions of medical professionals with respect to the medical treatment of an inmate. However, if "a

reasonable person would likely determine [the medical treatment] to be inferior," the fact that an official is not medically trained will not shield that official from liability for deliberate indifference. *Snow*, 681 F.3d at 986 (internal quotation marks omitted); *see also McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (stating that non-medical personnel may rely on medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner") (internal quotation marks omitted).

To bring a § 1983 claim against a municipality or a private entity performing a government function—such as the private company providing Idaho inmates with medical treatment under contract with the IDOC—a plaintiff must allege that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains, as required by *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694 (1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities performing a government function). Under *Monell*, the requisite elements of a § 1983 claim against such an entity are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

If Plaintiff files an amended complaint, he should clarify whether he is asserting a claim of inadequate medical treatment.

## 4.      Standards for Amended Complaint

If Plaintiff chooses to amend the Complaint, Plaintiff must demonstrate how the actions complained of have resulted in a deprivation of Plaintiff's constitutional rights. *See Ellis v. Cassidy*, 625 F.2d 227, 229 (9th Cir. 1980), *abrogated on other grounds by Kay v. Ehler*, 499 U.S. 432 (1991). Plaintiff must also allege a sufficient causal connection between each defendant's actions and the claimed deprivation. *Taylor*, 880 F.2d at 1045; *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss" or to survive screening under 28 U.S.C. §§ 1915 and 1915A. *Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982); *see also Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." (internal quotation marks and alteration omitted)).

INITIAL REVIEW ORDER BY SCREENING JUDGE - 24

Rather, for each cause of action against each defendant, Plaintiff must state the following: (1) the name of the person or entity that caused the alleged deprivation of Plaintiff's constitutional rights; (2) facts showing the defendant is a state actor (such as state employment or a state contract) or a private entity performing a state function; (3) the dates on which the conduct of the defendant allegedly took place; (4) the specific conduct or action Plaintiff alleges is unconstitutional; (5) the particular federal constitutional provision (or state law provision) Plaintiff alleges has been violated; (6) facts alleging that the elements of the violation are met—for example, Plaintiff must allege facts satisfying the elements of a due process or Eighth Amendment claim; (7) the injury or damages Plaintiff personally suffered; and (8) the particular type of relief Plaintiff is seeking from each defendant.

Further, any amended complaint must contain all of Plaintiff's allegations in a single pleading and cannot rely upon, attach, or incorporate by reference other pleadings or documents. Dist. Idaho Loc. Civ. R. 15.1 ("Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, must reproduce the entire pleading as amended. The proposed amended pleading must be submitted at the time of filing a motion to amend."); *see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) ("[An] amended complaint supersedes the original, the latter being treated thereafter as non-existent."), *overruled in part on other grounds by Lacey v. Maricopa County*, 693 F.3d 896, (9th Cir. 2012) (en banc); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc*., 896 F.2d 1542, 1546 (9th Cir. 1990) (holding that the district court

erred by entering judgment against a party named in the initial complaint, but not in the amended complaint).

Plaintiff must set forth each different factual allegation in a separate numbered paragraph. The amended complaint must be legibly written or typed in its entirety, and it should be clearly designated as the "First Amended Complaint." Plaintiff's name and address should be clearly printed at the top left corner of the first page of each document filed with the Court.

If Plaintiff files an amended complaint, Plaintiff must also file a "Motion to Review the Amended Complaint." If Plaintiff does not amend within 60 days, or if the amendment does not comply with Rule 8, this case may be dismissed without further notice. *See Knapp v. Hogan*, 738 F.3d 1106, 1110 (9th Cir. 2013) ("When a litigant knowingly and repeatedly refuses to conform his pleadings to the requirements of the Federal Rules, it is reasonable to conclude that the litigant simply *cannot* state a claim.").

## ORDER

**IT IS ORDERED:**

1.  Plaintiff has 60 days within which to file an amended complaint as described above. If Plaintiff does so, Plaintiff must file (along with the amended complaint) a Motion to Review the Amended Complaint. If Plaintiff does not amend within 60 days, this case may be dismissed without further notice. Any amended complaint will be limited to 20 pages. *See* General Order 342, *In Re: Procedural Rules for Prisoner Civil Case*

INITIAL REVIEW ORDER BY SCREENING JUDGE - 26

*Filings and for Prisoner E-Filing Program*, § A(1)(a). Alternatively,

Plaintiff may file a Notice of Voluntary Dismissal if he no longer intends to

pursue this case.

2.   Plaintiff's Motion for Appointment of Counsel (Dkt. 4) is DENIED without

prejudice. Plaintiff may renew the request for counsel if he files an

amended complaint.

DATED: August 14, 2020

B. Lynn Winmill
U.S. District Court Judge

INITIAL REVIEW ORDER BY SCREENING JUDGE - 27